DECISION
Defendant denied Plaintiffs property exemption application for the 2007-08 tax year, and Plaintiff timely appealed. Plaintiff was represented by Greg Hitchcock, Attorney-at-Law, of Davis Wright Tremaine, LLP. Defendant was represented by Jed R. Tompkins, Assistant County Attorney, Multnomah County. The matter is before the court on cross-motions for summary judgment.
 I. STATEMENT OF FACTS
A. The Subject Property
The appeal involves a 2,100 square foot building Plaintiff acquired in 1977, identified in the assessor's records as Account R101548. (First Stipulation of Facts at 2, para. 2 [Stip Facts].) There is only the one building on the property. (Id., para. 4) The building includes two meeting areas or halls of about 850 square feet each, and a kitchen and lounge area for gathering. (Id.) It has a capacity of 125 to 150 people. (Id.) The facility is a converted residential property which appears to be located in a residential neighborhood. (Stack Affidavit at 1, para. 2; Stip Facts, Ex 8.[1]) *Page 2 
There are no dedicated areas of specific use on the property, and all portions of the property are either used specifically by Plaintiff for its own purposes or are rented by Plaintiff to outside users (i.e., individuals and groups who are not members of Plaintiff's organization). (Stip facts at 2, 3, para. 12, 17.) Renters include religious and non-religious groups and individuals.
B. Plaintiff's Organization
The parties agree that Plaintiff is a religious organization for purposes of ORS 307.140, [2] and an incorporated charitable institution for purposes of ORS 307.130. (Stip Facts at 2, para. 10, 11.) According to its Articles of Incorporation, Plaintiff's purpose is "[t]o provide for the worship of almighty God and the spiritual growth of its members in accordance with the principles and practices of Subud." (Stip Facts, Ex 1 at 1.) Plaintiff follows the religious mission and philosophy of Subud USA, and uses the bylaws of that national organization. (Stip Facts at 2, para. 6, 7.)
Subud USA is a Colorado not-for-profit corporation that, according to its bylaws, is organized "to provide a structure to support the activities, in the United States of America, of the association of Susila Budhi Dharma, [also] known as Subud." (Stip Facts, Ex 2 at 1.) Subud USA's organizational purposes include "facilitat[ing] the worship of Almighty God through the Latihan Kejiwaan," and "assisting Subud affiliates engaged in educational, cultural, benevolent, and charitable works which in the opinion of the members are consistent with the aims and purposes of Subud." (Id.) Subud USA "is one of several separate, autonomous national organizations, which associate to form the international association of Subud known as World Subud Association." (Id.) *Page 3 
Susila Dharma USA, Inc., is an Internal Revenue Code (IRC) section 501(c)(3) corporation "formed * * * for scientific, educational, and charitable purposes * * * to provide a means for the members of Subud U.S.A. * * * to promote the general welfare of mankind by gathering funds for, assisting in the establishment of and/or providing financial support for projects such as homes for the aged, hospitals, schools and other social welfare programs." (Stip Facts at 2, Ex 4 at 1.) According to the stipulated facts, "Susila Dharma USA, Inc. * * * is the organization that does charitable activities for Subud USA and in which [Plaintiff] participates." (Stip Facts at 2, para. 8.)
According to sworn statements of Latham Stack, Plaintiff's Secretary, Plaintiff is primarily a non-denominational spiritual organization whose mission includes charitable, humanitarian, and cultural aspects, fulfilled through Susila Dharma USA, Inc. (Stack Affidavit, at 1, 2, para. 2, 3.) Susila Dharma fundraising projects in which Plaintiff was involved in 2006 and 2007 include two events for a project in the Congo "that operates schools and clinics supporting mothers and children in rural villages[,]" another fundraiser for projects in India "that provide[s] schooling for 350 children and micro-credit funding for mothers' cooperative groups[,]" a fundraiser for a project in Vietnam, Cambodia and Burma "that provides prostheses, rehabilitation, mental health counseling, and job training for land mine survivors[,] [and] a fundraiser for a refuge and schooling for orphan children in Uganda and Tanzania[.]" (Id. at 2.) Plaintiff also engaged in regular "charitable projects or fundraising efforts" for a local nonprofit health center "that treats a wide variety of chronic and life challenging illnesses including cancers, HIV/AIDS, and substance abuse, and focusing on people who are low income and without insurance[.]" (Id.) *Page 4 
C. Plaintiff's Membership and Operation
Plaintiff has three weekly scheduled worship services at its Portland property called latihan.[3] (Stip Facts at 2, para. 13.) There is a fourth scheduled weekly meeting for "helpers" who have practiced long enough to answer questions for those interested in learning more about "receiv[ing] the Latihan." (Id., Ex 2 at 1.) Plaintiff also hosts monthly group meetings, potluck social dinners, film nights, and fund-raising dinners for humanitarian causes. (Id.)
Membership in Plaintiff's local Portland organization is available to anyone over the age of 18 who sincerely desires to follow Plaintiff's form of worship, regardless of gender, sexual orientation, cultural background, ethnicity, or religious beliefs. (Stip Facts at 3, para. 14.) There are no fees, dues, or charges to practice latihan. (Id.) There are 25 to 30 local members who regularly practice latihan and others who participate less regularly. (Id.)
D. Actual Useage of the Property
The stipulated facts indicate that "[i]t is a general principle of the Subud religion to be of service to the community." (Stip Facts at 3, para. 16.) In that regard, the parties agree specifically to the following:
 "15. In addition to Subud's use of the Property, Subud rents the Property for use by others ("outside users"). Historical rental use of the Property by outside users includes but is not limited to, meetings; weddings and wedding receptions; family gatherings, such as reunions, anniversaries, and birthdays; memorial services; music concerts; art shows; theatrical performances; and storytelling.
 "* * * * *
 "17. In 2005, 2006 and 2007 the usage of the Property was: 62% of the hourly usage of the Property was for Subud's own religious and charitable use; 6% of the hourly usage was for religious functions by outside users; 6% of the hourly usage was for weddings, wedding receptions and memorial services by outside users; 14% of the hourly usage was for educational purposes by outside *Page 5 
users; 8% was for nonprofit organization meetings by outside users; and 4% was for outside community uses.
 "18. [Indicating that Exhibit 6 includes detailed information on the usage of the property for the years set forth above.]
 "19. The rents charged for the facility are: $125 for one meeting room for up to 5 hours; $200 for both meeting rooms for up to 5 hours; and a $250 for the entire building for up to 5 hours.
 "20. Subud makes the community aware of the availability of its facility for rental purposes through its website, its outgoing telephone message, [4]
and flyers available to the public."
(Amended First Stipulation of Facts at 3, 4, para. 15 — 20.)
E. Plaintiff's Exemption Status
In 1977, Plaintiff applied for and was granted property tax exemption for the 1977-78 tax year under ORS 307.140 (1975). (Stip Facts at 2, para. 3.) Plaintiff remained exempt from property taxes until 2007. (Id.) Plaintiff received two change of status notifications from Defendant in February and March 2007, both of which indicated that the subject property would be 100 percent taxable beginning with the 2007-08 tax year.[5] (Brown Affidavit at 1, para. 4; Exs. B-1, B-2.) *Page 6 
On March 26, 2007, Plaintiff applied for exemption under ORS 307.140. (Brown Affidavit, Ex B-3; Def s Cross-Mot for SJ and Resp at 2.) The stated purpose of the organization, as set forth in Plaintiffs application, is as "an international spiritual brotherhood that meets several times a week to worship God." (Brown Affidavit, Ex B-3.) That application further indicates that Plaintiff "occasionally" rents out space on an hourly or daily basis. (Id.)
On March 29, 2007, Defendant denied Plaintiffs exemption application based on a determination that the property "[d]oes not qualify in accordance with ORS 307.140(1) OAR 150-307.140(l)(c)." (Ptf's Compl at 7; Def s Cross-Mot for SJ and Resp at 2.) Plaintiff timely appealed, requesting that the court grant it a property tax exemption for religious and charitable purposes. Defendant, in its Answer, asked that the court sustain its denial of Plaintiff s exemption application.
 II. ISSUE
The issue in this case is whether Plaintiffs property qualifies for property tax exemption under ORS 307.140 as a religious organization, or under ORS 307.130 as a charitable institution.
 III. ANALYSIS
A. Burden of Proof and Rules of Construction in Exemption Cases
The burden is on the taxpayer to prove that a claim of exemption meets the statutory requirements. ORS 305.427; Golden Writ of God v. Dept. ofRev., 300 Or 479, 483, 713 P2d 605 (1986) (Golden Writ of God). In analyzing exemption cases, the court is guided by the principle that taxation is the rule and exemption from taxation is the exception.Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev., 301 Or 423, 426-27,723 P2d 320 (1986). Exemption statutes are strictly but reasonably construed. German Apost. Christ. Church v. Dept. of Rev., 279 Or 637,640, 569 P2d 596 (1977); Washington County v. Dept. of Rev., 11 OTR 251,254 (1989). This *Page 7 
court has ruled that "[s]trict but reasonable construction does not require the court to give the narrowest possible meaning to an exemption statute. Rather, it requires an exemption statute to be construed reasonably, giving due consideration to the ordinary meaning of the words of the statute and the legislative intent." North Harbour Corp. v.Dept. of Rev., 16 OTR 91, 95 (2002).
B. Applicable Law
ORS 307.140(1) exempts from taxation "property owned or being purchased by religious organizations" including "[a]ll houses of public worship and other additional buildings and property used solely for administrative, education, literary, benevolent, charitable, entertainment and recreational purposes by religious organizations, [and] the lots on which they are situated * * *."
ORS 307.130(1)(a) provides exemption for property of incorporated charitable institutions, provided the property "is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions."
C. Statutory Test — Primary Use
In Mult. School of Bible v. Mult. Co., 218 Or 19, 27-36, 343 P2d 893
(1959), the Oregon Supreme Court interpreted the requirement in ORS307.130 for exclusive occupation or use to mean primary use for an exempt purpose. See also House of Good Shepherd v. Dept. of Rev.,300 Or 340, 345-47, 710 P2d 778 (1985). The court stated that "[i]t is the primary as distinguished from an incidental use that determines whether it is exempt from taxation." Mult. School of Bible, 218 Or at 29. Quoting from People ex rel. Marsters v. Rev. Saletyni Missionaries,Inc., 409 Ill 370, 99 NE2d 186, 189 (1951), the court in Mult. School ofBible went on to explain: *Page 8 
 "`When the primary purpose is an exempt one, any incidental use of the exempt property for another purpose does not negative the exemption when the incidental use is not for profit.'"
218 Or at 29.
Based on the court's interpretation that the requirement in ORS307.130 for exclusive occupation and use meant primary use, the court held exempt from taxation a building on a college campus occupied by the school's superintendent of buildings and the school's dining hall supervisor because "the purposes used appear[] * * * to be primarily and directly for the benefit of the school, although incidentally it may have contributed in a degree to the benefit and convenience of the school employees residing there." Id at 37.
Some 18 years later, the Oregon Supreme Court announced a two-part test for exemption under ORS 307.130, by which the taxpayer must demonstrate that "the property substantially contributes to the furtherance of the charity's goals[,]" and that "it * * * be shown that the property was `exclusively occupied or used' for such a purpose." German Apost.Christ. Church v. Dept. of Rev., 279 Or 637, 641-42, 569 P2d 596 (1977). The court then summarized its test as follows: "[i]f, then, the primary use of the property is reasonably necessary for the charitable functions of the taxpayer, an exemption under ORS 307.130 will be allowed." Id. at 642. The word "charitable" in ORS 307.130 has been construed to include the advancement of religion. Archdiocese of Portland v. Dept. of Rev.,5 OTR 111 (1972), aff'd 266 Or 419, 513 P2d 1137 (1973); House of GoodShepherd v. Dept. of Rev., 300 Or. 340, 347, 710 P2d 778 (1985).
Immediately after summarizing the two-part test applicable to ORS307.130 (primary use and reasonable necessity), the court in GermanApost. Christ. Church stated that ORS 307.140 "lends itself to similar analysis." 279 Or at 642. The court went on to state *Page 9 
that, "[t]o qualify for such an exemption, the primary use of the property must advance charitable purposes or goals of the religious organization." Id. (emphasis added). Moreover, "the use of the property, if charitable, does not have to fulfill a religious function or be directly related to the religious goals of the church." Id. However, "if the charitable use is the advancement of religion, then such use must be primarily for the benefit of the church as well as reasonably necessary for the furthering of the religious aims of the church." Id.
Thus, under both statutes, the focus is on the primary use of the property, and it is that use that determines qualification for exemption. The word "primary" means "first in rank or importance: CHIEF, PRINCIPAL"Webster's Third New Int'l Dictionary 1800 (unabridged ed 2002 ed.)
In this case, it is clear that the primary use — the chief or principal use — of Plaintiff's property is for religious and charitable purposes. Plaintiff's purpose is both the advancement of religion and charity. Plaintiff's primary use of the property for its religious purposes alone qualifies it for exemption under either of the two statutes, given that religion is the focus of ORS 307.140, and constitutes a qualifying charitable use under ORS 307.130.
As indicated in the statement of facts above, the parties agree that Plaintiff is a religious organization for purposes of ORS 307.140 and an incorporated charitable institution for purposes of ORS 307.130. Plaintiff's Articles of Incorporation state that its purpose is "[t]o provide for the worship of Almighty God * * *" (Stip Facts, Ex 1 at 1.) Plaintiff also follows the religious mission and philosophy of Subud USA, a Colorado not-for-profit corporation, and the parties have stipulated that Plaintiff uses that organization's bylaws, which include "assisting Subud *Page 10 
affiliates engaged in educational, cultural, benevolent, and charitable works * * *" (Id., Ex 2 at 1.) Thus, Plaintiff's purpose is both religious and charitable, the latter considered part of its religious purpose, rendering all of its use as religious and, by case law, charitable (because religious use is charitable under ORS 307.130).
The subject property is a house of public worship. There are three scheduled worship services on the property each week and a fourth weekly meeting for discussion about Plaintiff's religion with persons interested in learning about the spiritual exercise they call latihan. Plaintiff also conducts numerous charitable fundraising events on the property each year. The parties agree that 62 percent of the hourly usage of the property is devoted to those practices. Another six percent of the hourly usage of the property is for religious functions conducted by outside groups. That brings the core religious use of the property to 68 percent. That, in itself, would seem to establish a "primary" religious and charitable use. As this court noted in Washington Co. Assessor II v.Jehovah's Witnesses, in non-resident mixed use cases, "so long as the use of the property relate[s] primarily to church business, the property [is] held exempt."[6] 18 OTR 409, 418 (2006).
Additionally, weddings, wedding receptions, and memorial services, which comprise an additional 6 percent of the property's usage, are typical uses for many, if not most, churches. (Stack Affidavit at 4, para. 11; LaChance Affidavit at 2, para. 6.) This brings the religious and charitable use of Plaintiff's property to 74 percent. The remaining uses, all by outside users, include educational meetings, other meetings by nonprofit organizations, and general community *Page 11 
uses. Such uses, which comprise the remaining 26 percent of the usage, are typical charitable functions and satisfy both ORS 307.130 and ORS307.140. Washington Co. Assessor II, 18 OTR at 414 (noting that "[c]haritable purposes include the advancement of religion and any other `generally recognized charitable function.'" (citations omitted)). Those uses are for the benefit of the community and typical of what churches and other charitable organizations that have meeting facilities have long allowed to be used at their property when they are not using the property themselves.
Defendant argues that the rental use of the property by nonreligious organizations who are not members of Subud disqualifies the property from exemption because that use, which Defendant incorrectly characterizes as "leasing," does not "substantially further" Plaintiffs charitable or religious goals. (Def s Cross-Mot for SJ and Resp, at 1, 6, 12, 13.) Defendant insists that the "exclusive use" requirement in ORS 307.130, and the "sole use" requirement in ORS 307.140 are sufficiently similar and equate to an exclusive use requirement whereby each separate and distinct use must satisfy the exclusive use requirement. (Def s Cross-Mot for SJ and Resp, at 8, 9, 15.) That argument fails because the primary use of the property is religious and charitable, and any incidental use of the property for other purposes is not for profit.[7] Mult. Schoolof Bible, 218 Or at 29. Plaintiffs own primary use of the property is religious and charitable, and its use of the property is reasonably necessary for Plaintiff s religious and charitable functions. GermanApost. Christ. Church, 279 Or at 642. Without the property, Plaintiffs members would have no place to meet. The other uses, which comprise 26 percent of *Page 12 
the property's usage, are part of the organization's larger mission and are therefore qualifying uses as part of Plaintiff s religious purposes.
One affiant, Subud's Secretary, stated that the organization not only seeks to be an asset to the community by making its facility available to community members at affordable prices, but "by inviting the community into our facility we are able to expose the community to the Subud mission and philosophy." (Stack Affidavit at 3, para. 8.) Thus, those outside member uses benefit the community, are intended to increase awareness of Subud's purpose and practices, and are typical of what churches and other charitable organizations that have meeting facilities have long allowed.
Because the court has determined that Plaintiffs primary use of the property is reasonably necessary for its religious and charitable functions, thus qualifying the property for exemption under both ORS307.130 and ORS 307.140, the court need not address Defendant's alternative arguments that Plaintiff does not engage in the requisite gift or giving required by ORS 307.130, [8] and that under ORS 307.140, the use of the property by organizations that are not religious organizations disqualifies the property from exemption.[9] There is simply no support in the case law for those arguments in the context of this case. As Plaintiff has noted, under the county's analysis, which insists there be 100 percent exclusive use consistent with the organization's mission, one hour of disqualifying use would necessitate revocation (or denial) of the tax exemption. That position is at odds with existing law. (Ptf s Reply Br and Resp at 5.) *Page 13 
Based on the foregoing, the court concludes that Plaintiffs property qualifies for exemption under both ORS 307.140 and ORS 307.130. As the Supreme Court observed in Mult. School of Bible, "while adhering to the rule of strict construction when constructing tax exemption statutes, the courts, in trying to capture the meaning of `exclusively used' [as provided in ORS 307.130] and kindred phrases [such as `solely' found in ORS 307.140], travel a road distinguished for its appreciation of common sense and reason." 218 Or at 33. Defendant's interpretation of the statutes is unreasonable and at odds with established law.
The bottom line is that the subject property is a church, and it is used primarily for the organization's religious purposes. Those purposes are also charitable in nature. When the property is not used specifically for religious services, it is used for charitable purposes, which, in Plaintiffs case, are deemed religious. Moreover, when outside groups use the property, the rate they pay is below market, and such use is therefore not for profit. To hold, as Defendant argues, that any use of the property by nonreligious organizations disqualifies the property from exemption is not only at odds with the law, but would have a catastrophic effect on many of the churches in this state.
 IV. CONCLUSION
The court concludes that Plaintiffs primary use of the property, which is both religious and charitable, is reasonably necessary for Plaintiffs charitable and religious functions and that the property qualifies for property tax exemption under ORS 307.130 and ORS 307.140. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiffs Motion for Summary Judgment is granted; and *Page 14 
IT IS FURTHER DECIDED that Defendant's cross-Motion for Summary Judgment is denied.
Dated this _____ day of January 2009.
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date of theDecision or this Decision becomes final and cannot be changed.
 This document was signed by Magistrate Dan Robinson on January 28,2009. The Court filed and entered this document on January 28, 2009.
[1] Exhibit (Ex) refers is to the exhibits submitted by the parties with the stipulated facts.
[2] Unless noted otherwise, all references to the Oregon Revised Statutes (ORS) are to 2005.
[3] According to the Bylaws of Subud USA, "`Latihan' refers to the spiritual exercise of Subud, which is a worship of God." (Stip Facts, Ex 2 at 1.)
[4] Plaintiff's outgoing telephone message states:
 "Hello, you have reached Subud Portland. General latihans are Monday and Thursday at 8 p.m. and Sunday at 10 a.m. To learn more about Subud, visit our web site at www.subudportland.org, or call either Benedict at 503-330-6536 or Beata at 503-246-8282. For information about renting the hall visit our website or call Holly at 503-289-5175 for more information."
(Stip Facts at 4, Ex 9.)
[5] Defendant's February 16, 2007, Notification of Status Change, indicated that the property "will become 100% taxable beginning with the tax year 2007/08"[,] because of a change of use of the property. (Affidavit of Sally A. Brown, Ex B-1.) Defendant's March 12, 2007, Notification of Status Change stated that the property "will become 100% taxable beginning with the tax year 2007/08 because "[t]he use of property does not qualify per ORS 307.140(1)." (Affidavit of Sally A. Brown, Ex B-2.)
[6] See also Church of the Brethren v. Coos County Assessor, TC-MD 990512D, WL 33117384 (Dec. 17, 1999) (finding entire 159 acre church camp exempt, including a large timbered area rarely physically used, notwithstanding rental of property to secular groups such as 4-H, grange, scout, school, and outdoor education, because disputed forested area was "integral to the Camp and reasonably necessary to support the [organization's] mission" — an outdoor ministry program — and the "entire property was essential to the religious practices of the [organization]." The court observed that the rental proceeds were used only to maintain the camp.)
[7] There is ample unrebutted evidence that Plaintiff's rental charges are below-market. See generally Ptf's Reply Memo at 8-10, and supporting affidavits. Among that evidence are statements by a Portland area event planner who states that "the rates charged by Subud are a below market value of what is charged by the typical church facility after accounting for size and quality of the venue." (LaChance Affidavit at 2, para. 8.) She further states that the rate for a "commercially-run facility of similar quality and features for a 5-hour rental would cost in the range of $450 to $650[,]" whereas Subud charges $250. (Id. at 2, para. 4.)
[8] "Charging fees does not automatically transform a charitable exempt organization into a nonexempt one." Found. of Human Understandingv. Dept. of Rev., 301 Or 254, 261, 722 P2d 1 (1986).
[9] That is because the focus under the statute, as interpreted by the Oregon courts, is on the primary use of the property. *Page 1