IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

DASMESH DARBAR SIKH TEMPLE,　　　　）
　　　　　　　　　　　　　　　　　　）
　　　　　　Plaintiff,　　　　　　　　　）　TC-MD 111207D
　　　　　　　　　　　　　　　　　　）
　　　v.　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
MARION COUNTY ASSESSOR,　　　　　）
　　　　　　　　　　　　　　　　　　）
　　　　　　Defendant.　　　　　　　　）　**DECISION**

Plaintiff appeals Defendant's denial of its Application for Real and Personal Property Tax Exemption, filed October 4, 2011. A trial was held in the Oregon Tax Courtroom, Salem, Oregon, on April 16, 2012. Teresa Ozias, Attorney at Law, appeared on behalf of Plaintiff. Bahadur Singh (President),[1] President; Jagmohen Singh (Member), Dasmesh Darbar Sikh Temple (Temple) member; Jagjat Singh (The Granthi), Temple priest; and Sat Hanuman Singh Khalsa (Khalsa), Northwest Regional Director, Sikh American Legal Defense and Education Fund, testified on behalf of Plaintiff. Scott A. Norris, Assistant County Counsel, Marion County, appeared on behalf of Defendant. Robb Witters (Witters), Marion County Senior Residential Appraiser, testified on behalf of Defendant.

Plaintiff's Exhibits 1 through 7 and Defendant's Exhibits A through E were admitted without objection.

/ / /

---

[1] When referring to a party in a written decision, it is customary for the court to use the last name. However, in this case, the court's Decision recites facts and references to three individuals with a similar name, Singh. To avoid confusion, the court will refer to an individual by the title of the individual, *e.g.*, President, Member, or The Granthi.

## I. STATEMENT OF FACTS

Plaintiff requests that the house provided as a residence for Plaintiff's three priests be exempt from property taxation for tax year 2011-12. President testified that until Plaintiff purchased the house in April 2011, the three priests lived in the Temple basement. President testified that the Temple was established in Salem, Oregon, at its current site in October 2005. He testified that a change in the law no longer permits the priests to live in the Temple basement. President testified that the house is approximately 500 feet from the Temple's main entrance. He testified that it is "traditional, for the last 500 years," that priests "live close to or in the temple to protect the scriptures (Guru Granth Sahib)." President explained that the scriptures are a 1,420 page book measuring 18" by 2' that is "treated as a living human being." Khalsa testified that the Guru Granth Sahib is transported to the sanctuary in a canopy bed. President testified that when "[a]pproaching the Guru Granth Sahib a person is expected to bow down and touch the floor as a sign of further respect to the Eternal Sikh Guru." (*See* Ptf's Ex 4.)

President testified that the house is 1,836 square feet with three bedrooms. (*See* Ptf's Ex 1, 7.) The Granthi (with the assistance of Ravinder Waraich, translator) testified that the three priests are the sole occupants of the house except during approximately 12 weekends each year when three "people from the outside" are invited to assist with the 48-hour continuous reading (beginning at 11:00 a.m. on Friday and ending at noon on Sunday) of the scripture (Guru Granth Sahib). President testified that the priests are paired and rotate every two hours. President and The Granthi testified that out-of-state visitors to the Temple are offered housing at the subject property. President and The Granthi testified that even though the Temple is open daily from approximately 4:00 a.m. to 10:00 p.m. the three priests are "on-call after 10:00 p.m." and expected to be "there to serve, pray or meditate with anyone who seeks them." The Granthi

testified that the priests sleep approximately five and one-half to six hours a night and take an hour nap during the day. In response to Defendant's question, President testified that there are "no religious activities at the house." Witters testified that Plaintiff stated that "there was not a requirement of the religion that the priests live in the house." Witters testified that based on information, including Plaintiff's bylaws and the Affidavit of Bahadur Singh, he received he concluded that the "house was a residence" and its use was a convenience rather than a necessity." (Def's Exs A, D.)

President and Khalsa testified about Sikhism, its beliefs, practices, symbols and names. (*See* Ptf's Exs 3-6.) The Granthi testified about the priests' daily schedule. He testified that the priests get up at 3:30 a.m. and open the Temple at approximately 4:00 a.m. President testified about the three activities that take place in the Sikh place of worship (Gurdwara): Kirtan, which is the "singing of hymns from the Guru Granth Sahib;" Katha, the "reading of the Guru Granth Sahib and explanations;" and Langar, a "free community kitchen for all visitors of all religions." (*See* Ptf's Ex 4.) The Granthi testified that daily meals are prepared and served by the priests. President testified that "food is always ready to be served." The Granthi testified that "kids come during the day" to the Temple. The Granthi testified that "people stop by [the Temple] whenever they feel like it." President testified that "part of the priests duties are to be at the Temple" and it is "important to the community" and the "religious tradition that the priests live close by to open the door and let in its members." President testified that the three priests (father, son and father's brother) were hired in October 2011, on a "three year contract." He testified that under the terms of the contract "food, shelter and medical are provided by the community" for the priests who are married with their families living in India. The Granthi testified about his training and duties. He testified that there must be at least two priests at the

Temple when it is open. Khalsa testified that The Granthi and other priests are at the Temple "to serve" the religious community and have "no other jobs." He characterized their service as "selfless" and believes that it reflects their "love and devotion to God."

## II. ANALYSIS

Plaintiff seeks a property tax exemption, stating that as a religious organization its use of the subject property as a residence for its priests meets the statutory requirements of ORS 307.140.[2] ORS 307.140 states in pertinent part that

> "Upon compliance with ORS 307.162, the following property owned or being purchased by religious organizations shall be exempt from taxation:
>
> (1) All houses of public worship and other additional buildings and property used solely for administration, education, literary, benevolent, charitable, entertainment and recreational purposes by religious organization, the lots on which they are situated, and the pews, slips and furniture therein."

After discussing applicable case law, this court in *Washington County Assessor v. West Beaverton Congregation of Jehovah's Witnesses, Inc.* (*Washington County*), 18 OTR 409, 422 (2006) clearly stated that:

> "With regard to residences, it is neither the vows of poverty and obedience nor the promise of free housing, nor even substantial religious use, that leads to exemption, but rather the religious and practical requirement of residence in close proximity to a specific house of worship, combined with actual use primarily for the benefit of the religion and not the resident. In close cases, exemptions must be denied."

In reaching this conclusion, the court examined the Supreme Court's two part test stated in *German Apostolic Christian Church v. Dept. of Rev.* (*German Apost. Christ. Church*), 279 Or 637, 643 (1977). First, the Supreme Court concluded that a "parsonage may be exempt under ORS 307.140 if, 'for example, the continuous presence of a religious leader near the church is needed to attend to the religious needs of the congregation. * * * It may also be true if lack of

---

[2] References to Oregon Revised Statutes (ORS) are to the 2009 edition.

alternative housing compels the church to furnish its own residence in order to attract a minister.'" *Washington County* at 422 (citing *German Apost. Christ. Church* at 643). In evaluating whether a parsonage or residence is tax exempt, the court noted that "the specific duties of [the official] which require his continuous presence near the house of worship of the church" are evidence of necessity. *Id.*

After reviewing case law, the court summarized the first requirement, stating that "the official living in the residence must be required to live there by either church doctrine or practical necessity." *Washington County* at 419. In the case before the court, the priests who live in the subject property are, in the words of President, carrying on the 500 year old tradition of living close to or in the temple to "protect the scriptures (Guru Granth Sahib)." The priests serve the religious community a minimum of 17 hours per day, opening the Temple at 4:00 a.m. and closing the Temple at 10:00 p.m. For approximately 12 weekends each year the priests read the scripture for a continuous 48-hour period, requiring a 16 hour commitment during that time. In addition, the priests are available to pray and meditate with any follower even if the Temple is officially closed. Those after-hour requests require the priests to leave the subject property and open the Temple. Prior to moving to the subject property, the priests lived in the basement of the Temple. Here, the priests devote approximately 17 hours each day to their religious duties, including preparing and serving food to worshipers; they are charged with protecting the scriptures housed in the nearby Temple. Similar to Catholic nuns required by their church to live in a convent and a Catholic priest required to live in the rectory located near the church, practical necessity requires that these priests reside in close proximity to the Temple. *See House of Good Shepherd v. Dept. of Rev.(House of Good Shepherd)*, 300 Or 340, 343 (1985) and *Roman Catholic Archdiocese v. Dept. of Rev. (Roman Catholic Archdiocese)*, 13 OTR 211, 213 (1995).

Second, the Supreme Court concluded that after "necessity is shown, the actual use of the parsonage must be examined. If such use is consistent with the claimed necessity the exemption should be allowed. * * * The requirement 'used solely' in the statute pertains to the character and not the amount of use." *German Apost. Christ. Church* at 643, 645. In the case before the court, the Sikh priests' commitment and duties are similar to Catholic nuns who live together to participate in a "communal, prayerful life" or a Catholic priest who lives in a rectory close to the church so the "priest [can] remain 'available at all times to attend to the needs of the parish.'" *See House of Good Shepherd* at 343-44; *Washington County* at 419 (quoting *Roman Catholic Archdiocese* at 213). The subject property is used as a residence for the three priests, who work in pairs to fulfill their religious commitment. Each year, the priests share the subject property with three other individuals who assist them with the 48-hour continuous reading. From time to time, the priests share the subject property with out-of-state church members who are in-transit. Each use is consistent with the claimed necessity that the residence be in close proximity to the Temple. The close proximity of the subject property to the Temple furthers the Sikh religious objectives of meeting the immediate spiritual needs of its members with only incidental benefit to the three priests. In evaluating the use of the residence, the residence's proximity to the Temple enhances the priests performance of their duties and service on behalf of the religious community "which would seem to render it highly expedient that they should reside where they do and not elsewhere." *Multnomah School of Bible v. Multnomah County*, 218 Or 19, 37, 343 P2d 893 (1959).

## III. CONCLUSION

After careful review of the testimony and evidence, the court concludes that "the religious and practical requirement of [the priests'] residence in close proximity to [the Temple],

combined with actual use primarily for the benefit of the religion and not the resident[s]," qualify the subject property for property tax exemption. *Washington County* at 418. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted.

Dated this ___ day of July 2012.


_____
JILL A. TANNER
PRESIDING MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on July 9, 2012. The Court filed and entered this document on July 9, 2012.*